**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **L.G. MOTORSPORTS, INC.** | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **CASE NO. 4:11CV112** |
| | § | |
| **NGMCO, INC.,** | § | |
| **CORVETTE RACING, INC.,** | § | |
| **MICHELIN NORTH AMERICA, INC.,** | § | |
| **and DOUG FEHAN** | § | |
| **Defendants.** | § | |

**MEMORANDUM ORDER, OPINION AND REPORT AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE**

Michelin North American and General Motors LLC have filed motions for summary judgment as to Plaintiff's L.G. Motorsports, Inc.'s remaining claims (Dkts. 72 and 73).  Also pending before the Court is Plaintiff's Motion for Leave to Amend Complaint (Dkt. 65).   As set forth below, the Court GRANTS the motion for leave to amend and finds that summary judgment should be GRANTED in its entirety as to General Motors and GRANTED in part and DENIED in part as to Michelin.

The gravamen of L.G. Motorsports' claim is that, because of the Defendants' conduct, its car can't cross the finish line without a Michelin.  All parties have stipulated that the "old" GM is not a party and has no liability in this case.  L.G. contends that the new GM urged Michelin not to sell its tires to L.G.  Unable to get the premier racing tire, L.G. lost the services of its driver and had to park its Corvette in a museum.

1

**STANDARD FOR MOTION FOR SUMMARY JUDGMENT**

Summary judgment is appropriate when, viewing the evidence and all justifiable inferences in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Hunt v. Cromartie*, 526 U.S. 541, 549, 119 S. Ct. 1545, 143 L. Ed.2d 731 (1999).  The appropriate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986).

The party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial.  *Provident Life & Accident Ins. Co. v. Goel,* 274 F.3d 984, 991 (5th Cir. 2001).  In sustaining this burden, the movant must identify those portions of pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2553, 91 L. Ed.2d 265 (1986).  The moving party, however, "need not negate the elements of the nonmovant's case."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  The movant's burden is only to point out the absence of evidence supporting the nonmoving party's case.  *Stults v. Conoco, Inc.*, 76 F.3d 651, 655 (5th Cir. 1996).

In response, the nonmovant's response "may not rest upon mere allegations contained in the pleadings, but must set forth and support by summary judgment evidence specific facts showing the

2

existence of a genuine issue for trial." *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Anderson*, 477 U.S. at 255-57, 106 S. Ct. at 2513-14).   Once the moving party makes a properly supported motion for summary judgment, the nonmoving party must look beyond the pleadings and designate specific facts in the record to show that there is a genuine issue for trial. *Stults*, 76 F.3d at 655.   The citations to evidence must be specific, as the district court is not required to "scour the record" to determine whether the evidence raises a genuine issue of material fact. E.D. TEX. LOCAL R. CV-56(d).   Neither "conclusory allegations" nor "unsubstantiated assertions" will satisfy the nonmovant's burden.   *Stults*, 76 F.3d at 655.

### SUMMARY JUDGMENT ANALYSIS

Both Michelin and GM move for summary judgement on L.G.'s claims of interference with contract and prospective contracts, as well as civil conspiracy and unfair competition.   The elements of a cause of action for tortious interference with an existing contract are (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; ( 3) such act was a proximate cause of damage; and (4) actual damage or loss occurred.   *See Browning - Ferris, Inc. v Reyna*, 865 S.W..2d 925 (Tex. 1993).   To recover for tortious interference with a prospective contract, a plaintiff must be able to prove an independent tort – that is, the plaintiff must prove that the defendant's conduct would be actionable under a recognized tort.   *See Wal-mart Stores v. Sturges*, 52 S.W. 3d 711,726 (Tex. 2001).

### Michelin's side of the story

Beginning in 2008, L.G. made a number of requests to race on Michelin tires.  Michelin declined the request because Michelin determined it was not in its best interest to be a trade partner with L.G.  Not all racing teams who request Michelins are provided with Michelin tires.  L.G. then asked that the ALMS put pressure on Michelin to furnish L.G. tires.  *See* Dkt. 73-3.  According to Michelin, L.G. then started accusing GM of hindering its ability to obtain tires.  GM emailed Michelin in March 2009 stating it had no objection to Michelin providing tires.  *See* Dkt. 73-4. Michelin informed GM that it would not partner with L.G., and this was relayed to L.G.

In 2008, Michelin did not have a tire design for the GT2 class Corvette.  *See* Koenigstein depo, Dkt. 73-5, at 38.  In 2009, L.G. asked Michelin several times if it could have Michelin tires. *See* Koenigstein depo, Dkt. 73-5, at 42.  Again, reviewing the factors Michelin examines, it declined to partner with L.G.  *See* Koenigstein depo, Dkt. 73-5, at 42.

L.G. contacted Michelin in 2010, but again, Michelin declined to partner with L.G.  *See* Koenigstein depo, Dkt. 73-5, at 49.  Michelin tires, when supplied, are only leased and tightly controlled.  *See* Dkt. 73-1 at 2-3.   The tires are only released to Michelin's partners a few days before the race.  *See* Dkt. 73-1 at 3.  The tires are then returned after the race and subjected to technical analysis by an engineer.  *Id.*

Who can be a partner?  According to Silvia Mammone, a former Michelin Brand Motorsports and Sponsorship Manager, she and Karl Koenigstein, with Michelin Motorsports, would look at several factors including the existence or absence of a marketing risk or benefit; technical risk or

4

benefit, public relations risk or benefit, stability of the partner and quality and experience of the racing team including the driver, tire size and construction availability, personnel support, financial resources of the partner and Michelin's desire not to poach a team supplied by another manufacturer. *See* Dkt. 73-1 at 3-4. Although a few over-the-counter tires were used in the 2008 GT2 racing series, such use proved to be unsatisfactory and Michelin did not approve any such further use by any team. *See* Dkt. 73-1 at 5.

Michelin claims that it has never had any express or implied agreement with GM to shut L.G. out of the tire market. Further, since 2007, Michelin has had no ALMS racing agreements with the old GM or new GM. *Id.* Mark Kent with GM also testified that there was no written or oral agreement between GM and Michelin precluding Michelin from providing tires to L.G. *See* Kent depo, Dkt. 73-9, at 110-111.

### L.G.'s side of the story

L.G.'s representative, Gigliotti, testified that before he would complete the purchase of his Corvette he wanted assurances from Michelin that it would furnish tires. From the deposition, it is unclear when this meeting took place. Later in his deposition, however, Gigliotti stated that Michelin told him it was just a matter of making sure that L.G. had a good budget, a signed contract (presumably with the driver), a bond and that Michelin would get back with the "details." *See* Gigliotti depo, Dkt. 77-2, at 61. Again, Gigliotti stated that this meeting took place at the press release at Petit Le Mans. *See* Gigliotti depo, Dkt. 77-2, at 63. He stated again it was just a matter of details. *See* Gigliotti depo, Dkt. 77-2, at 64. Gigliotti then stated that he found out in November

(2007) that Michelin would not supply the tires.  *See* Gigliotti depo, Dkt. 77-2, at 64-65.  Gigliotti later identifies this event as occurring in the fall of 2007.  *See* Gigliotti depo, Dkt. 77-2, at 149.  This was after he had already paid more than half for the Corvette.  *See* Gigliotti depo, Dkt. 77-2, at 64.  He says that in subsequent conversations (not specified with whom), it came out that GM wanted to keep total development of the tires for their competitive Corvette.  *See* Gigliotti depo, Dkt. 77-2, at 65.  He says at one time Michelin said as to providing tires that it would get back to him in a couple of days but Michelin had to make a phone call to GM.  *Id*.  Gigliotti says that he parked the car after 2009 because he was unable to get tires.  *See* Gigliotti depo, Dkt. 77-2, at 68.

Gigliotti also testified that Mammone told him that GM wanted an exclusive.  *See* Gigliotti depo, Dkt. 77-2, at 106-107.  He replied "Then all you're excluding in this exclusive contract with GM is me."  *See* Gigliotti depo, Dkt. 77-2, at 107.  To which he claims she replied, "Yeah."  *Id.*

He also testified that Koenigstein told him that Michelin did not want to get GM's data mixed up with L.G.'s data.  *See* Gigliotti depo, Dkt. 77-2, at 142.  Gigliotti also testified that he was aware that there was no rule in the ALMS series that each competitor would have the same tires or have access to the same tires.  *See* Gigliotti depo, Dkt. 77-2, at 62.

Gigliotti further testified that he lost the contract that his driver Doug Peterson paid him for driving the car.  *See* Gigliotti depo, Dkt. 77-2, at 161.  However, he also testified that at the time Peterson signed the contract to drive the Corvette, Peterson knew that Michelin tires would not be available.  *See* Gigliotti depo, Dkt. 77-2, at 162.  L.G. told Peterson to give it a chance with the Kuhmo tire and if it didn't work out Peterson could back out of the contract.  *See* Gigliotti depo, Dkt.

77-2, at 162-163. L.G. even tested the Kuhmo against the Dunlop and against the Michelin over the counter tires. *Id.* He claims he lost not only the contract but also sponsorships and the ability to sell parts and equipment. Peterson left sometime in the 2008 season. *See* Gigliotti depo, Dkt. 77-2, at 177.

### GM's side of the story

GM claims that there is simply no evidence that "new" GM did anything to render it liable on any of L.G.'s claims. The parties have stipulated that the old GM is not liable for any of the conduct alleged in the complaint. Most, if not all, of L.G.'s substantive complaints concern the old GM.

L.G. has stipulated that GM can not be liable for the homologation or failure to homologate any Corvette through Riley Technologies. The parties have also stipulated that "new" GM can only be held liable for conduct occurring after July 10, 2009.

GM contends that L.G. knew by September of 2008 that "old" GM was not going to homologate the Riley Corvette. *See* Gigliotti depo, Dkt. 77-2, at 31. Riley Technologies sued the "old" GM for failure to homologate the Riley Corvette (the one purchased by L.G.). *See* Gigliotti depo, Dkt. 72-3, at 79-80. L.G. never joined in the suit or filed a proof of claim for the conduct of "old" GM. *See* Gigliotti depo, Dkt. 77-2, at 32.

Reviewing the record as a whole, the best L.G. can allege as to "new" GM is that, sometime in the fall or late summer of 2009, Mark Kent from GM told L.G. that GM was "working on" the homologation. *See* Gigliotti depo, Dkt. 77-2, at 45. The Court can find no other evidence as to

"new" GM, other than this isolated statement.  In any event, "new" GM cannot be liable for contractual interference since Peterson stopped driving before GM's bankruptcy.  L.G. has also not demonstrated that GM engaged in any conduct that was independently tortious or unlawful that interred with any prospective contracts.

### L.G.'s side of the story

L.G. alleges that a member of GM's Corvette racing crew stated that Fehan and GM were not going to let L.G. have tires after what L.G. did to them in the World Challenge.  L.G. contends that GM's conduct with Michelin precluded any prospective contracts.  L.G. contends that GM has admitted its conduct was sharp.  The Court finds that no such admission was made and that L.G. has taken license in its spin of this fact.  L.G. claims that GM disparaged it and this is an independent tort which gives rise to its interference with contractual claim action.  However, the remark, if disparaging at all, was made by a member of the Pratt Miller Cadillac team, not GM.

### The Court's Analysis

Having completed an exhaustive review of the motions, responses, replies, as well as the record and exhibits, the Court finds that summary judgment on the interference claims is warranted for both GM and Michelin.  At best, Plaintiff has been able to point to mere innuendos or speculation as to what it think happened between the two defendants.  As to GM, Peterson quit before old GM's bankruptcy, so it would be hard for new GM to interfere with a contract that did not exist.  Mammone's remark that she would have to check with GM does not establish a genuine issue of material fact that there was any kind of a back door agreement.  In fact, for a period of three racing

8

seasons, L.G. was told that Michelin did not want to partner with L.G., and one remark over a three-year period does not create a fact issue.  Even if Mammone did contact GM, there is no evidence what they discussed or what decision was arrived at by the parties, if any such decision was ever made.

According to the summary judgment record, GM told L.G. that it had no problem with L.G. acquiring Michelin tires.  Notwithstanding the emails, both Kent and Mammone testified that there was no implied or express agreement to keep tires from L.G.  L.G. has simply not created a fact issue otherwise.

For L.G. to maintain a tortious interference claim, it must produce some evidence that one or more of the defendants knowingly induced Peterson to breach his obligations under a contract. *See All Am. Tel., Inc. v. USLD Commc'ns. Inc.*, 291 S.W. 3d 518, 532 (Tex. App.– Fort Worth 2009, pet. denied)*.*  As to prospective contracts, there is no evidence of any agreement between GM and Michelin.  Taking GM out of the picture, if Michelin standing alone refused to lease its tires to L.G., such would not be unlawful.  If the conduct was merely sharp or unfair, it would not be an independently actionable tort.  *See Specialties of Mexico Inc. v. Masterfoods USA*, 2010 WL 2488031, *10 (S.D. Tex. 2010) (*citing Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001)).

Likewise, the civil conspiracy claim is closely linked to the interference claim.  Even assuming an agreement not to lease tires, such does not rise to the level of an independent tort. *Masterfoods USA*, 2010 WL 2488031 at *11.  The fourth element of the cause of action is missing,

9

*i.e.* one or more unlawful, overt acts. *See generally Massey v. Armco Steel Co.*, 652 S.W. 2d 932,934 (Tex. 1983).

Likewise, GM and Michelin are entitled to summary judgment on L.G.'s claims for unfair competition. Liability for unfair competition requires some finding of an independent substantive tort or other illegal conduct. *See generally, Taylor Publishing Co. v. Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir. 2000). For the reasons noted above, there is no such evidence.

Therefore, summary judgment for Michelin and GM should be granted on all remaining claims. Yet, GM and Michelin have yet to cross the finish line.

At the last hour L.G. has filed a Motion for Leave to Amend Complaint (Dkt. 65). The motion is understandably opposed by the Defendants. L.G. seeks to amend its complaint to add promissory estoppel as a claim. According to L.G., at the deposition of Michelin's representative, the representative gave several reasons for not providing Michelin tires to L.G. in support of its racing efforts. The reasons **were never** communicated to L.G. L.G. claims that at the same time Michelin had promised to provide tires. L.G.'s representative, Gigliotti, stated that in October 2007 he met with another Michelin representative and Bill Riley. At that meeting, the Michelin representative, Mammone, promised that tires would be provided. According to Gigliotti's deposition, he testified that, at the meeting, that the provision of tires came down to a matter of details — details about a bond, details about the contract to follow, verification of a sponsor and a "money man" on board.

The scheduling order provided that amended pleadings were to be filed within 30 days after a decision by the Court on defendants' motions to dismiss.  Plaintiff filed its First Amended Complaint on April 9, 2012, within the deadline provided by the scheduling order.  Nothing in the First Amended Complaint gives a hint as to promissory estoppel.

Once a court has entered a scheduling order and the deadline for amending pleadings has passed, the decision to permit post-deadline amendments is governed by Rule 16(b) of the Federal Rules of Civil Procedure, not Rule 15. *Southwestern Bell Tel. Co. v. City of El Paso,* 346 F.3d 541, 546 (5th Cir.2003).  Pursuant to Rule 16, a scheduling order should not be modified unless there is a showing of good cause.  *See S & W Enters., L.L.C. v. SouthTrust Bank of Ala.,* 315 F.3d 533, 536 (5th Cir. 2003) ("We take this opportunity to make clear that Rule 16(b) governs amendment of pleadings after a scheduling order deadline has expired."); *see also* FED.R.CIV.P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent.").

The Fifth Circuit has set forth four factors for determining whether a movant has established good cause for modification of a scheduling order after the deadline has passed:

(1)     the explanation for the failure to timely move for leave to amend;

(2)     the importance of the amendment;

(3)     potential prejudice in allowing the amendment; and

(4)     the availability of a continuance to cure such prejudice.

*S & W Enters., L.L.C.,* 315 F.3d at 536.  "The 'good cause' standard focuses on the diligence of the party seeking a modification of the scheduling order."  *Forge v. City of Dallas*, No. 3:03–CV–0256–D, 2004 WL 1243151, at * 2 (N.D.Tex. June 4, 2004).  A party's mere inadvertence

to meet a deadline imposed by a scheduling order, and the absence of prejudice to the opposing side, are insufficient to establish good cause. *Id.* Rather, one must show that "despite his diligence, he could not have reasonably met the scheduling deadline." *Id.* (quoting *Am. Tourmaline Fields v. Int'l Paper Co.,* No. 3:96–CV–3363–D, 1998 WL 874825, at *1 (N.D.Tex. 1998)). Rule 15(a), which allows for liberal leave to amend, only comes into play once the moving party has demonstrated good cause under Rule 16(b). *S & W Enters.,* 315 F.3d at 536.

The Court notes that there is currently no trial setting, the case deadlines having been abated by agreement of the parties pending resolution of the motions for summary judgment (*see* Dkt. 69). Even if there were a pre-trial conference date, it would be months at best before the case could come to trial given this district's and division's oppressive criminal docket. The parties jointly agreed to abate all deadlines pending resolution of the summary judgment motions.

L.G. says it did not know of the purported reasons for Michelin's actions until it took Mammone's deposition. For some reason, all parties waited until shortly before the discovery deadline to take a number of depositions. The Court assumes that, at the deposition of Mammone, L.G.'s counsel had a sudden revelation that promissory estoppel might be a viable theory. The request to amend was made shortly after the expiration of the discovery deadline and the deposition of Mammone. In other words, L.G. was a little slow out of the pits — for which it blames Michelin. The parties entered into an agreed order to extend the discovery deadline until November 12, 2012. The motion to amend was filed before the end of fact discovery.

Certainly the amendment is important because it is the only hope of relief to L.G. — otherwise L.G. will run out of gas before the finish line. As to prejudice, an amendment will not

12

prejudice GM because it is out of the case.  As to Michelin, again there are no deadlines, and trial is only a distant possibility.  No continuance is necessary because, as stated, there is nothing to continue.  In fact, no additional discovery is really necessary.  The Court finds that the facts involving Michelin's reasons for not leasing tires to L.G. arguably give rise to a fact issue.  This was not fleshed out until shortly before the discovery deadline.  No further fact discovery is necessary. Therefore, Plaintiff's Motion for Leave to File Amended Complaint (Dkt. 65) is GRANTED, and the only issue for trial should be promissory estoppel as to Michelin.

### ORDER AND RECOMMENDATION

The Court GRANTS Plaintiff's Motion for Leave to Amend Complaint (Dkt. 65) and recommends that Defendant General Motors LLC's Motion for Summary Judgment (Dkt. 72) be GRANTED in its entirety and Plaintiff take nothing by its claims against GM, that Defendant Michelin North America, Inc.'s Motion for Summary Judgment Against Plaintiff on All Claims (Dkt. 73) be GRANTED as to all claims addressed in the motion, but that Plaintiff's newly added promissory estoppel claim against Michelin proceed to trial.

Within fourteen (14) days after service of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C).

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual

findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

   **SIGNED this 5th day of June, 2013.**


_____
DON D. BUSH
UNITED STATES MAGISTRATE JUDGE